MAKAR, J.,
concurring in part, dissenting in part.
Shands Teaching Hospital and Clinics, Inc., seeks review of the trial court’s order denying its motion to dismiss the complaint of the Estate of Ashley Lawson, which seeks to proceed against the Hospital with a negligence claim without resorting to the medical malpractice presuit screening requirements of chapter 766, Florida Statutes (2013). Our three judge panel divided evenly, one member voting to deny the petition, one to grant the petition, leaving the opinion that follows (modified a- bit) as a middle ground, one that would adopt the Second District’s opinion in Lakeland Regional Medical Center v. Pilgrim, 107 So.3d 505 (Fla. 2d DCA 2013). Like our panel, the en banc court has splintered its vote, albeit producing a majority view. Because the question of whether, the presuit requirements apply in this case involves a mixed question of fact and law that cannot be determined from the complaint alone, the case should be remanded for further proceedings consistent with Pilgrim.
I.
The Estate’s complaint arises from the death of Ashley Lawson, a psychiatric patient who received medical services in the secured psychiatric care facility at the Hospital. According to the complaint, Ms. Lawson “was admitted to [the Hospital] on November 1, 2012, as a psychiatric patient with a history of psychiatric illness, drug abuse, impulsive behavior, and multiple suicide attempts.” It further stated that “[f]or her own safety, [she] was transferred to [the Hospital’s] inpatient locked unit” and that the Hospital “owed a legal duty to provide, adequate security for [her] and other psychiatric patients who resided in the locked unit.”
As the basis for liability, the complaint alleged that the Hospital “breached its [legal] duty when its employee negligently left her keys and badge unattended and kept them unattended for an unreasonable period of time which allowed [Ms. Lawson] to exit the locked unit with said keys and badge.” As a result, she “impulsively eloped and made her way to the interstate in a confused condition and without any money, cell phone, or warm clothing. She was, then, struck by a tractor trailer, resulting in her death on January 23, 2012.”
The Estate’s complaint expressly disavowed that the action was based on medical negligence. The complaint specified that it was “an ordinary negligence action” and “not an action for medical malpractice.” Further, it stated it was “not an action for negligent psychiatric treatment, negligent psychiatric diagnosis, or negligent psychiatric care.” Paragraph twelve of the complaint specifically alleged that “[a]t the time the employee negligently left her keys and badge unattended, the employee was not rendering medical or psychiatric care” to Ms. Lawson.
Notwithstanding these disavowals, the Hospital moved to dismiss the complaint for failure to satisfy presuit requirements, arguing that the allegations sounded in medical negligence. The Hospital pointed out that the complaint alleged a duty was owed to psychiatric patients in the “locked unit” of the psychiatric facility to be kept safe while being treated for psychiatric illnesses, including — in Ms. Lawson’s *336 case — drug abuse, impulsive behavior, and suicidal tendencies. Viewing these allegations as the basis for a standard of medical care for psychiatric patients like Ms. Lawson when assigned to a locked- psychiatric unit, the Hospital asserted the action “is clearly one in medical malpractice” and subject to the “requirements of Chapter 766, Florida Statutes, including without limitation the requirements-for presuit investigation and corroboration of grounds for such a' claim.”
The Estate responded that its complaint, on its face, alleged only ordinary, not medical, negligence that happened'to occur in a medical facility. Specifically, the breach occurred when the Hospital’s “employee negligently left her keys and badge unattended and kept them unattended for an unreasonable amount of time, which allowed Ashley .Lawson to exit a locked unit with said keys and badge.”. This negligent act, though occurring in the psychiatric care unit, “involved no medical skill or knowledge ... misdiagnosis on admission or afterwards or any improper treatment.”
At the hearing on its motion, the Hospital urged that the complaint’s allegations of inadequate security had to be judged by the standard for security of a psychiatric hospital overseeing psychiatric patients in a locked unit; the provision of security in this environment must be viewed “in light of the particular type of patient and the psychiatric illness and the threat that that patient represents, all of which entails a medical judgment, a psychiatric analysis of that patient, as well as that facility.” The Estate again countered that its complaint did not allege medical negligence, and no medical treatment or evaluation was alleged. It analogized the alleged security breach as akin to the decision of whether to leave a gurney rail up or down, which lacks a medical basis.
After argument, the trial court denied the Hospital’s motion, saying “I don’t know what the facts are going to show one way or the other, but I háve to take that allegation particularly in Paragraph 12 on its face value and say this particular employee was not rendering medical or psychiatric care at the time.” In denying the motion, the trial court made “perfectly clear to everyone [that] I’m not resolving this issue overall. I’m saying that at this stage, having to give deference to the allegations and the complaint, I don’t think I could grant a motion to dismiss.” An unelabo-rated written order followed.
II.
As a preliminary matter, certiorari jurisdiction exists to review the denial of the Hospital’s motion, the potential effect of which would be to subject the Hospital to defending a claim in contravention of Florida’s Medical Malpractice Reform Act. See Sova Drugs, Inc. v. Barnes, 661 So.2d 393, 394 (Fla. 5th DCA 1995) (“If the case is fully litigated, without resort to the pre-suit procedures, that purpose [of the Act] would be frustrated, and appellate courts could not properly remedy the cause on appeal.”). Irreparable harm occurs when a court improperly denies a motion to dismiss for failure to follow presuit requirements because the defendant irretrievably loses the cost-saving benefits the Act was intended to provide. Holmes Reg’l Med. Ctr., Inc. v. Dumigan, 151 So.3d 1282, 1284 (Fla. 5th DCA 2014).
Turning to the merits, whether a suit raises an issue of medical negligence for purposes of statutory - presuit notice requirements involves' a case-by-case approach, one that is guided by the statutory definition of “medical negligence” and the panoply of cases attempting to articulate a dividing line between situations subject to the presuit process and those that are not. *337 To date, the district courts’ cbllective attempts to “draw a clear, predictable line” between such cases' “has not been entirely' successful.” Pilgrim, 107 So.3d at 508. Where standards exist, they can be difficult to apply in specific cases, resulting in a degree of inconsistency and uncertainty. See, e.g., Holmes, 151 So.3d at 1286 (“This Court has previously held that ‘[t]he primary test for whether a claim is one for medical malpractice is whether the claim relies on the application of the medical standard of care’... Application of this standard is. not always easy or consistent.”) (citation omitted).
As we said in Broadway v. Bay Hospital, Inc., 638 So.2d 176 (Fla. 1st DCA 1994), the test for determining if presuit screening requirements apply is “whether the defendant is directly or vicariously lia-' ble under the medical negligence standard of care as set forth in section 766.102(1), Florida Statutes.” Id. at 177; see § 766.106(1)(a), Fla. Stat: (claims for médical negligence or malpractice are those “arising out of the’ rendering of, or the failure to render medical care or services”). The statutory standard for medical care is in section 766.102(1), which states that the “prevailing professional standard of care for a given health care provider shall be that level of care, skill,- and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.” § 766.102(1), Fla; Stat.
Given this statutory guidepost, the starting point in determining whether medical negligence is at issue is what is alleged in a complaint. Broadway, 638 So.2d at 177. For example, at issue in Broadway was a complaint seeking recovery from a hospital after a patient “was injured when her hospital bed collapsed.” Id. Because it was apparent that the facts alleged could only support a non-medical negligence claim, “rather than for breach of some- professional standard of care,” this Court ruled that dismissal was improper and the lawsuit would proceed; it was unnecessary to delve beyond the “face of the complaint.” See also Tenet St. Mary’s Inc. v. Serratore, 869 So.2d 729, 731 (Fla. 4th DCA 2004) (negligently kicking a -patient’s foot while trying to adjust reclining chair is ordinary negligence because there was “clearly no professional standard of care involved in- attempting to kick a footrest of the reclining chair to return it to its upright position”). Noting that “[n]ot every wrongful ’act by a health care provider amounts to medical malpractice,” the Court in Broadway drew a contrast with Neilinger v. Baptist Hospital of Miami, Inc., 460 So.2d 564 (Fla. 3d DCA 1984), in which the “complaint alleged that the plaintiff, a maternity patient, slipped and fell on a pool of amniotic .fluid while descending from an examination table under the direction and care.of employees of the hospital.” 638 So.2d at 177. In contrast to Ms. Broadway’s purely non-medical negligence claim, the “complaint [in Neil-inger] on its face alleged breach of a professional standard of care.” Id.
While the starting point is what a complaint says, and plaintiffs have the right to assert what they believe is the true nature of the negligence alleged, simply labeling a claim as one not involving medical negligence is not dispositive of the judicial inquiry. See Omni Healthcare, Inc. v. Moser, 106 So.3d 474, 475 (Fla. 5th DCA 2012) (finding that although the plaintiff attempted to allege a claim in simple negligence, the claim soundéd' in medical negligence). Cloaking a medical malpractice claim in non-medical verbiage; if rotely accepted from the face of a complaint, could defeat the legislative intent of the presuit process; disavowals that a claim is for ordinary, versus medical, negligence do *338 not control. Dr. Navarro’s Vein Ctr. of Palm Beach, Inc. v. Miller, 22 So.3d 776, 778 (Fla. 4th DCA 2009) (complaint’s claim of general negligence for laser hair removal is one for medical negligence despite “plaintiffs creative dance around the obvious”). Thus, if the face of the complaint suggests a possible breach of a medical standard of care, a trial court’s responsibility is to determine as early and expeditiously as possible whether grounds for dismissal exist, much like is done in resolving jurisdictional disputes. Pilgrim, 107 So.3d at 508 (“Even though the [presuit] issue needs to be resolved at the beginning of the lawsuit, it may involve factual questions comparable to those that must be decided at the beginning of a case to resolve a jurisdictional issue.” (citing Venetian Salami Co. v. Parthenais, 554 So.2d 499 (Fla.1989) (footnote omitted))).
Let’s turn now to the Estate’s complaint. To support its position that a medical negligence claim underlies the complaint’s allegations, the Hospital contends the Estate’s negligence claim implies, if not states directly, that decisions about psychiatric patient security, involve some degree of medical judgment; after all, not all psychiatric patients have the same degree of risk of flight or risk of harm to self or others. Unlike other hospital patients who are free to leave if physically able to do so, psychiatric patients like Ms. Lawson may be subject to confinement as part of their treatment plans. And at least inferentially, a standard of medical care exists regarding how those overseeing a psychiatric facility are to ensure patients at risk for flight, suicide, and other such risks are appropriately restricted. See Young v. Bd. of Hosp. Dirs. of Lee Cnty., 426 So.2d 1080, 1081 (Fla. 2d DCA 1983) (physician, though excluded for lacking sufficient experience, tendered to testify about medical standard in case where involuntary patient in a psychiatric ward “escaped from the ward, ran into the streets, and was struck and injured by a car”). The presuit process on the books at the time Young was decided required that medical negligence claims be heard first by a medical mediation panel.
A review of the caselaw finds none directly on point. The Hospital’s view is supported by Indian River Memorial Hospital v. Browne, 44 So.3d 237, 238 (Fla. 4th DCA 2010), which involved a 76-year-old admittee to an emergency room where he “fell off a stretcher and suffered head injuries that caused his death.” The complaint against the hospital alleged that the patient “was admitted to the emergency room in a disoriented and confused state and the hospital improperly supervised him and left the bed’s guardrail unsecured.” Id. Concluding that the claim involved medical negligence, the Fourth District said that the “standard of care for the hospital’s treatment of [the emergency room patient] is based in part on the hospital’s evaluation of his medical condition when he was admitted to the emergency room.” Id. at 238-39. The failure to “implement adequate procedures to protect emergency room patients from falling from hospital beds” includes a medical component. Id. at 239. (“The adequacy of the hospital’s procedures depends on the prevailing professional standard for managing and supervising those admitted to emergency rooms. These types of issues 'arise out of the rendering of, or the failure to render, medical care or services.”).
The parallel in this case to Indian River is that the face of the Estate’s claim contains two key allegations that indicate that the negligence alleged may be based, at least in part, on the breach of a professional medical standard of cars. The first is that Ms. Lawson “was admitted to [the Hospital] ... as a psychiatric patient with a history of psychiatric illness, drug abuse, *339 impulsive behavior, and multiple suicide attempts,” such that “[f]or her own safety ... [she] was transferred to [the Hospital’s] inpatient locked unit.” These allegations suggest that Ms. Lawson had a specific medical condition that might warrant the implementation of standards of care to protect her. The second, which completes the loop on the first, is that the Hospital “owed a legal duty to provide adequate security for [her] and other psychiatric patients who resided in the locked unit.” Together, these two allegations suggest that the security to be provided was linked to, if not dependent upon, the medical status and needs of each psychiatric patient.
Much like Indian River, the standard of care for the Hospital’s treatment of psychiatric patients may be “based in part on the hospital’s evaluation of his medical condition when he was admitted” to the psychiatric inpatient locked facility. Id. at 238-39. By interlineation with the words of the Indian River court, the failure to “implement adequate procedures to protect [psychiatric] room patients from” escaping a locked psychiatric unit includes a medical component. Id. at 239. Because the “adequacy of the hospital’s procedures depends on the prevailing professional standard for managing and supervising those admitted to [psychiatric facilities that include an inpatient locked unit], these types of issues arise out of the rendering of, or the failure to render, medical care or services.” Id. A difference between Indian River and this case is that the former involved admission to an emergency room while the latter involves admission to a psychiatric facility, but Indian River is persuasive in favor of the Hospital’s position.
The Estate counters that Indian‘River can be distinguished because it asserts no claim that the Hospital was negligent in assessing Ms. Lawson’s psychiatric condition; instead, the Hospital adequately diagnosed that condition, but failed to implement its generic security plan when an employee negligently left keys and a badge where Ms. Lawson could access them. Of course, the failure to keep a psychiatric patient safe from her own actions is not unlike failing to give medicines, or leaving them unattended for the patient to take indiscriminately. Leaving a scalpel in a surgical patient could be considered an act of ordinary negligence if viewed in isolation from its médical context; similarly, leaving keys unattended in a medical facility could be considered an act of ordinary negligence if viewed in isolation from its psychiatric context. Even if Ms. Lawson’s condition was assessed correctly, the- Hospital’s duty to patients in a locked unit is to prevent harm that could result from their acting upon them impulses or idea-tions. Like Indian River, the failure here appears to be based, in part, on implementation of protocols related to a patient’s specific medical condition. The Estate says its claim is like the situation in Lake Shore Hospital, Inc. v. Clarke, 768 So.2d 1261, 1251 (Fla. 1st DCA 2000), where a hospital’s patient “fell as she walked from her hospital bed to the bathroom.” No medical dimension to the fall was evident. A mere slip and fall of this type, without more, sounds in ordinary negligence; in contrast, the adequacy of a psychiatric unit’s security plan and its implementation as to a particular patient in a locked inpatient unit plausibly involves at -least some degree of medical judgment, thereby distinguishing Lake Shore Hospital. See also St. Joseph’s Hosp., Inc. v. Cintron, 998 So.2d 1192, 1194 (Fla. 2d DCA 2009) (anti-dumping claim, on its face, did not set for basis for medical negligence). Some degree of professional medical judgment may be necessary in balancing the relative degree of freedom and restraint a psychiatric *340 patient with specific risk factors will have while in the facility.
The Estate further relies on Joseph v. University Behavioral LLC, 71 So.3d‘ 913, 919 (Fla. 5th DCA 2011) and Robinson v. West Florida Regional Medical Center, 675 So.2d 226, 227 (Fla. 1st DCA 1996).[1] Though both involve psychiatric facilities, they are distinguishable because each involved attacks by one patient upon another and each was decided via summary judgment after- some degree of discovery. Though the health care defendants in each case attempted to show the breach of a psychiatric standard of care, neither asserted the type of individualized, patient-centric standard that is potentially at issue in this case; instead, in both cases the alleged negligence involved inadequate security “independent of any medical diagnosis, treatment, or care.” Robinson, 675 So.2d at 228; see Joseph, 71 So.3d at 919 (Fla. 5th DCA 2011) (refuting facility’s claim at trial, that “everything .that happens in a psychiatric care facility is psychiatric treatment and any negligence is within the realm of medical malpractice”). Moreover, each arose after the trial court had been presented with some evidence beyond that in the complaint itself. See Robinson, 675 So.2d at 228 (“On its face, the complaint, to which the deposition testimony adds few facts, is for inadequate security, independent of any medical diagnosis,. treatment, or care.”). .
What is to be done in light of the presence of a- possible medical negligence claim, in this case? The trial judge felt hampered, making it “perfectly clear” to the parties that he was “not resolving this issue overall,” needing more information to make a reasoned judgment. And the Estate leaves open, if not encourages, the possibility that the Hospital can reassert its position at later stages of the proceeding via a summary judgment if it believes that pre-suit requirements have been met. See id. (leaving open possibility for defendant “to show, with further development of the record, by way of proof of its affirmative defense, that any wrongful conduct on its part did arise from medical diagnosis, treatment or care .... ”); ■ see also Cin-tron, 998 So.2d at 1194 n. 1 (“Our opinion should not be read as foreclosing St. Joseph’s from raising appropriate objections should the. case develop into a medical malpractice claim.”). But the cost and delays of litigation- are the very burdens that the presuit process was designed to avoid; a favorable summary judgment entered years and thousands of dollars in legal bills after a complaint is filed would be a Pyrrhic victory for health care..entities that should never have incurred such costs at all; it could also be a calamitous setback for plaintiffs whose claims — because of the .passage of time — are barred by the lapse of applicable statutes of limitations.
A pivotal point is that no substantiation yet exists in this case that a medical standard of care 'actually exists in the real world for securing individual psychiatric patients in a psychiatric ward; perhaps affidavits or testimony of medical' experts will say it exists, perhaps not. To con- *341 elude at this point that this ease must be based on medical negligence, because conflicting expert opinions may be presented on this issue at some point, puts the suture before the scalpel; the pre-suit process applies only if, as a matter of law, it is first proven that a medical standard actually exists in the specific context alleged. That question can’t be answered yet on this record. See Pilgrim, 107 So.3d at 509 (“[Njeither the trial court nor this court should guess at an outcome.”). Much like the cystology brush in Pilgrim, about which judicial speculation was required to determine whether a medical duty of care attached in its maintenance, insufficient information exists to conclude whether a medical duty underlies the negligence alleged in this case. A mixed question of fact and law exists, one upon which judicial minds differ, and for which additional background and details would be useful, if not critical, in promoting informed judicial decision-making.
Viewed in this light, the most reasonable approach in this type of situation is described by Judge Altenbernd in Pilgrim, which provides for the filing of affidavits and a possible “limited evidentiary hearing,” the overall purpose of which is to determine expeditiously at the outset of litigation whether a claim is based on medical negligence and subject to pre-suit. Id. at 509 (“If the factual basis for the claim remains disputed, it may be necessary for the trial" court to conduct a limited eviden-tiary hearing, comparable to the hearing used to resolve a Venetian Salami jurisdictional dispute, to determine whether this case falls within the ambit of chapter 766.”). When a complaint is vague or raises an unanswered , question of whether medical negligence is involved, the “parties are entitled to a process that presents evidence by affidavit or evidentiary hearing.” Id. This approach best achieves the intended legislative goal of the pre-suit process, which is similar to jurisdictional and standing disputes, see Chuck v. City of Homestead Police Department, 888 So.2d 736, 751 (Fla. 3d DCA 2004) (en banc) (requiring evidentiary hearing on “the issue of standing” and adopting the procedure set forth in Venetian Salami), the point being that by adjudicating disputes at the start of a lawsuit, overall litigation costs are substantially reduced and medical negligence claims are channeled into the pre-suit process in a timely way. The upfront cost of securing affidavits that address whether a medical standard of care exists, or a limited evidentiary hearing on the matter (if the trial court deems one necessary), is a far smaller price to pay than &■ costly “kick-the-pre-suit-ean-down-the-road” approach that serves neither party well. In this case, the Hospital’s petition should be granted, allowing it to contest the Estate’s allegations of ordinary negligence by, for example, filing affidavits establishing that a -medical standard of care exists or seeking a limited evidentiary hearing as in Pilgrim, which we should adopt.

. The Estate also points to Southern Baptist Hospital of Florida, Inc. v. Ashe, 948 So.2d 889, 891 (Fla. 1st DCA 2007), which involved the negligent release of a patient in “violation of mandatory and non-discretionary requirements of Florida's Baker Act.” This Court held that the claim of the patient's estate sounded in ordinary, rather than medical negligence, even though the statute required " documented approval of a psychiatrist, a clinical psychologist, or ... an attending emergency department physician with experience in the diagnosis and treatment of mental and nervous' disorders” for her release. Id. In contrast to Ashe, this case appears to fall closer to a breached treatment protocol versus the neglected statutory prerequisites in that case.